IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| MIGNON R. ANTHONY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:22-cv-00107 (AJT/IDD) |
| | ) | |
| ALEXANDRIA CITY PUBLIC SCHOOLS, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## **MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Alexandria City School Board's[1] Motion to Dismiss, in which it seeks dismissal of Plaintiff's seven count Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure [Doc. No. 19] (the "Motion"). Plaintiff alleges in Counts I-III, discrimination, hostile work environment, and retaliation on the basis of sex, all in violation of Title VII; in Counts IV-VI, discrimination, hostile work environment, and retaliation on the basis of age, all in violation of the ADEA; and in Count VII, discrimination in violation of Title IX.

For the reasons stated below, the Motion to Dismiss [Doc. No. 19] is GRANTED as to Counts I, II, III, V, and VII of the Amended Complaint; and DENIED as to Counts IV and VI of the Amended Complaint.

## I.    BACKGROUND

On January 15, 2018, the Alexandria City School Board ("ACSB") retained as Chief Operating Officer ("COO") Plaintiff Mignon R. Anthony ("Plaintiff"), a 63 year-old female with

---

[1] Alexandria City School Board operates the Defendant Alexandria City Public Schools.

"over thirty years' experience leading and managing," among other things, "major institutional change, "real estate design and construction," and "organization transformations."[2] [Am. Compl. ¶¶ 6 n.1, 11, 13.] As COO, Plaintiff had executive oversight for (i) the transportation system, (ii) the food and nutrition programs and system, (iii) facilities and maintenance operations, (iv) a $600 million capital improvement and modernization budget, general design, and construction projects, (v) health and safety, and (vi) security operations. [*Id.* ¶ 14.] Throughout her tenure, Plaintiff performed her duties well and was highly regarded as a leader and professional. [*Id.* ¶ 15.]

In the spring of 2018, ACSB announced the hiring of Dr. Gregory Hutchings, Jr. ("Hutchings") as the new superintendent. [*Id.* ¶ 17.] Hutchings officially assumed the position on or about June/July of 2018. [*Id.*] Hutchings possessed no prior experience in the level of capital improvements Plaintiff had been hired to direct for ACSB. [*Id.*] Almost immediately, Plaintiff alleges, Hutchings "made it clear" to Plaintiff that "he was offended" when Plaintiff "would reference her extensive experience as a resource to him and/or in his presence," forcing Plaintiff to "walk on eggshells in conversations" with Hutchings. [*Id.* ¶¶ 17-18.] Hutchings "generally took the posture of not seeking or taking advice from individuals who were older women . . . instead choosing to only dictate to them what he wanted them to do." [*Id.* ¶ 18.]

In or around June/July of 2019, approximately one year after Hutchings' hiring, ACSB hired Dr. Stephen Wilkins ("Wilkins") as Chief of Human Resources. [*Id.* ¶ 19.] Wilkins previously served as the COO for Hutchings in a different school district. [*Id.*] Plaintiff alleges "things began to change immediately after Dr. Wilkins' arrival." [*Id.*] For example, Plaintiff's regularly scheduled one-on-one meetings with Hutchings began to be decreased in frequency or

---

[2] Prior to becoming COO, Plaintiff had previously received interest from the Alexandria City Public Schools ("ACPS"). In 2016, former ACPS superintendent Dr. Alvin Crawley contacted Plaintiff to express his interest in Plaintiff's expertise in major school capital projects. [*Id.* ¶ 12.] In 2017, former acting ACPS superintendent Dr. Lois Berlin formally recruited Plaintiff to join the Alexandria City joint city-school task force. [*Id.*]

even cancelled, including meetings relating to several significant capital projects. [*Id.*] Wilkins also began to regularly attend every meeting with Hutchings even if the meeting had no relationship to his department (Human Resources). [*Id.*] ACPS' Senior Leadership Team ("SLT") questioned Hutchings about Wilkins' frequent meeting attendance. [*Id.* ¶ 20.] Hutchings explained that Wilkins was merely "getting up to speed." [*Id.*] Hutchings then informed Plaintiff and SLT that Wilkins should become familiar with the Capital Improvement Program ("CIP") budget—an issue outside the purview of Human Resources. [*Id.*]

       i.   <u>Bus Driver Complaints</u>

In September/October of 2019, Hutchings called into a meeting Plaintiff and Charles Stone ("Stone")—a 71 year old male who served as Director of Transportation. [*Id.* ¶ 21.] Wilkins also participated in the meeting. [*Id.*] At the meeting, Hutchings and Wilkins "vaguely detailed complaints made by bus drivers" to Hutchings and the Board that centered on the drivers' dissatisfaction with their pay and training, and the drivers' alleged threat to strike. [*Id.*] According to the Plaintiff, the meeting was out of the ordinary because these complaints are typically directed to Plaintiff and the head of the relevant department. [*Id.* ¶¶ 21-22.] In another break from precedent, Hutchings never provided Plaintiff with a copy of the alleged transportation employee complaints or any other specific details. [*Id.* ¶ 23.]

Following that meeting, Hutchings instructed Plaintiff to attend a meeting with Wilkins and transportation employees. [*Id.* ¶ 24.] However, the following day, Wilkins told Plaintiff that, in accordance with Hutchings' instructions, Plaintiff would no longer attend the meeting; instead Wilkins and Sandra Hardemen—51 year old female Director of Employee Relations—would attend the meeting with the transportation employees. [*Id.*] Following that meeting, Hutchings placed Stone on administrative leave despite Stone having done nothing wrong, explaining that

Stone was a "lightning rod" in the transportation department and it was best if he was temporarily removed from the situation. [*Id.* ¶¶ 25, 25 n.7.] Plaintiff later came to hear from several transportation employees and other senior managers that Hutchings made comments during his personal addresses to transportation employees that "came across as taking personal aim at Mr. Stone." [*Id.* ¶ 28.]

Plaintiff was greatly concerned by Hutchings' approach to both the transportation employee's situation and Stone. [*Id.* ¶ 26.] Over the next few weeks, Plaintiff made numerous unsuccessful attempts to discuss the matter with Hutchings. [*Id.* ¶ 27.] In addition to canceling meetings with Plaintiff, Hutchings informed Plaintiff that Wilkins and his team would be in charge of investigating the transportation employee situation. [*Id.*] This effectively eliminated Plaintiff's executive responsibility and authority over the transportation system. [*Id.* ¶ 28.] Hutchings limited Plaintiff's role to "minimiz[ing] any conflict between transportation employees with" Dr. Wilkins and Dr. Hutchings. [*Id.*] Hutchings also directed Plaintiff to hold Q&A sessions with transportation employees every week "during the exact same time as the weekly SLT meetings, and even went so far as to change the time of the SLT meeting when [Plaintiff] shifted the transportation meeting to be able to attend." [*Id.*] Plaintiff alleges this action "appeared purposeful" so as to eliminate Plaintiff's "executive participation from key strategy and operating issues of the school system" and also humiliated Plaintiff because it "sent a strong message" that Plaintiff no longer possessed "any authority in this situation" and was being subject to harassment and discrimination by Hutchings. [*Id.*]

Wilkins eventually prepared a summary report following his transportation investigation. [*Id.* ¶ 29.] The summary focused on Stone's managerial faults over the more prominent issue of the need for a better pay scale. [*Id.*] After Hutchings, at an all hands meeting with transportation

employees and without ACSP approval, made a guarantee of budget adjustments for pay increases, the employees' complaints were largely silenced. [*Id.*] Plaintiff disagreed with Hutchings' decision to promise a pay scale increase without proper budget approval. [*Id.* ¶ 30.] Even though Hutchings' promise largely resolved the employees' unrest, Stone remained on leave and was ordered to stay away from transportation. [*Id.* ¶ 29.]

Plaintiff "felt she had no other choice but to bring her concerns to ACSB" about Hutchings' departure from budget policy as well as his disparate treatment of older employees, including herself and Stone. [*Id.* ¶ 30.] Throughout October 2019, Plaintiff made numerous requests to meet with Hutchings to discuss her concerns. [*Id.*] Hutchings ignored each request for a meeting. [*Id.*]

Following her failed attempts to meet with Hutchings, Plaintiff then drafted a letter of concern and complaint. [*Id.* ¶ 31.] Plaintiff tried to speak with Hutchings about her letter on several occasions, including sitting outside his office. [*Id.*] After failing to meet with Hutchings, Plaintiff submitted her letter to the Chair of ACSB, Cindy Anderson, detailing her concerns about Hutchings' treatment of Stone and his handling of the transportation employees' complaints. [*Id.*, Ex. 1.] Plaintiff also provided a copy of the letter to Hutchings. [*Id.*]

ACSB called a special closed meeting on November 14, 2019. [*Id.* ¶ 32.] On November 21, 2019, Cindy Anderson responded, on behalf of ACSB, to Plaintiff's letter, advising Plaintiff to discuss the matter with Hutchings. [*Id.*] Plaintiff alleges this redirection was contrary to ACSB's policy for complaints against a superintendent. [*Id.* ¶ 33.]

Upon receipt of Plaintiff's letter to ACSB, Hutchings called Plaintiff into a meeting in which Wilkins was also present. [*Id.* ¶ 34.] Plaintiff noted that Wilkins' presence made her uncomfortable, given his conflicting role in the situation, to which Hutchings responded that Wilkins would be present as a witness in every meeting with Plaintiff going forward. [*Id.*] Plaintiff

requested to have her own witness present for the meeting and that she be able to record it. [*Id.*] Hutchings refused both requests, insisting that any recording would be illegal. [*Id.*] During that same meeting, Hutchings told Plaintiff he viewed her letter to the ACSB as a "betrayal" and specifically called Plaintiff a "traitor." [*Id.* ¶ 35.] Hutchings further indicated that he "was particularly offended by the accusation of bias." [*Id.*] Plaintiff allegedly responded that she believed Hutchings had always been biased against Stone because of his age. [*Id.*] Plaintiff based that statement on comments Hutchings regularly made regarding Stone, including that Stone was "stodgy and monotone" which suggested to Plaintiff that Hutchings was calling Stone "dull and old." [*Id.* ¶ 35, n.9.] Hutchings acknowledged that "he never thought positively of Mr. Stone." [*Id.* ¶ 35.] Hutchings also accused Plaintiff of failing to properly do her job which caused Hutchings to intervene in the transportation dispute. [*Id.*] Following that meeting, Hutchings did not provide Plaintiff with any further one-on-one meetings despite continuing to hold such meetings with every other SLT member. [*Id.* ¶ 36.] Hutchings referenced Plaintiff's disloyalty at meetings with Plaintiff's peers. [*Id.*]

On November 15, 2019, at a regularly scheduled weekly SLT meeting, Plaintiff, along with the Directors of Operations, Planning, and Procurement, made a joint presentation on an ongoing project to Hutchings and the SLT. [*Id.* ¶¶ 37-38.] Hutchings abruptly interrupted the presentation and "stated in a highly agitated and demonstrative manner with flailing arms and pointed fingers that [Plaintiff] had been insubordinate to him" after she had continued with the project despite his instructing her to stop all work. [*Id.* ¶ 38.] Plaintiff's SLT colleagues and other staff who were present were shocked by Hutchings' actions. [*Id.* ¶ 39.] Several SLT members and presenting officials came to Plaintiff's defense by reminding Hutchings of his involvement in the project and that his claims of insubordination were inaccurate. [*Id.*] These comments "further enraged"

Hutchings who "became irate and began yelling at [Plaintiff] and disparaging her further in front of her colleagues" and then stormed out of the room. [*Id.* ¶ 40.] Hutchings later apologized to David Banks—a 40 year old male Director of Procurement and co-presenter—about his outburst but never apologized to Plaintiff. [*Id.* ¶ 41.]

ii.  <u>Organizational Restructuring</u>

Several days after Hutchings' November 15th outburst, his executive assistant informed the SLT that Hutchings would be sequestered for two weeks while he developed a restructuring plan for his senior leadership team. [*Id.* ¶ 42.] Only Wilkins and the Chief Financial Officer, Dominic Turner (male, 30s), were allowed to meet with Hutchings during this two week period. [*Id.* ¶ 43.] On December 6, 2019, Hutchings, with Wilkins also in attendance, held a meeting with Plaintiff where he showed Plaintiff a portion of his restructuring plan in the form of an organization chart. [*Id.* ¶¶ 43-44.] As reflected in the restructuring plan, the COO position—the one held by Plaintiff—would be eliminated. [*Id.* ¶ 44.] Hutchings informed Plaintiff that her tenure would be over by June 30, 2020 (the end of the current contract year). [*Id.*] Hutchings also eliminated the Chief Human Resources Officer position and combined the COO and Chief Human Resources Officer positions into a new Chief of Staff position, with Wilkins serving as the new Chief of Staff. [*Id.*]

Hutchings presented the restructuring plan to ACSB on December 19, 2019, and ACSB approved the plan several weeks later, on January 9, 2020. [*Id.* ¶ 45.] The plan was scheduled to take effect on July 1, 2020, the start of the FY2021 budget year. [*Id.* ¶ 46.]

The restructuring affected seven employees, all of whom were over the age of 40 (ages 45, 52, 52, 55, 65, 66, 71). [*Id.* ¶ 45, Ex. 2.] Four of the seven positions were in Plaintiff's management

team while the other three fell under the Chief Academic Officer. [*Id.* ¶ 45.] The changes included the following:

- Demotion of Plaintiff's second-in-command, a 52 year-old female [*Id.* ¶ 48];

- Elimination of the position held by a 45 year-old male employee who was offered and accepted a restructured role/position while his 55 year-old female counterpart's position was eliminated without an offer of a new position. [*Id.* ¶ 49];

- Elimination of Stone's position [*Id.* ¶ 50];

Plaintiff alleges Hutchings unlawfully discriminated against Plaintiff as well as others of similar age and sex under the guise of this restructuring. [*Id.* ¶ 51.]

Once ACSB approved the restructuring, Human Resources created a new position, Executive Director of Facilities and Operations, which was organizationally lower than, but nonetheless mirrored, Plaintiff's role as COO with respect to the operational direction of the same five sub-departmental areas. [*Id.* ¶ 52.] The Executive Director of Facilities and Operations position, however, required an advanced degree which Plaintiff did not possess. [*Id.* ¶¶ 52-53, n.14.] Plaintiff alleges ACSB arbitrarily applied this advanced degree minimum requirement "in order to eliminate [Plaintiff's] eligibility to compete for the position." [*Id.* ¶ 53.] Dr. Alicia Hart (female, 30s), who was one of Plaintiff's direct reports, was made the Acting Executive Director of Facilities and Operations. [*Id.* ¶ 54.]

Plaintiff alleges that she continued to be treated unfairly during the remaining six months of her tenure. [*Id.* ¶ 55.] For instance, Plaintiff was ignored, intentionally left out of meetings, and "made to feel like her ideas and process changes that she implemented could not be effective given her advanced age." [*Id.*] During this same period, while still an employee, ACSB locked Plaintiff out of much of the HR system and took away her supervisory authority. [*Id.* ¶ 56.] Wilkins and Hutchings were "openly dismissive and hostile" towards Plaintiff. [*Id.*] At meetings with other employees, Hutchings and Wilkins referred to Plaintiff's ideas as "old school" and generally

disparaged Plaintiff. [*Id.*] This led to an environment of "daily confusion, declining communication, and stress between [Plaintiff], her direct reports, and their staff." [*Id.* ¶ 57.] Plaintiff continued to carry out her duties as COO until her position was terminated at the end of June 2020. [*Id.* ¶ 58.]

On July 21, 2020, Plaintiff filed a complaint with the Alexandria Office of Human Rights alleging discrimination, specifically disparate treatment, harassment, and unlawful termination based on her age and sex, and retaliation. [*Id.*, Ex. 3 at 1.] The Alexandria Office of Human Rights investigated Plaintiff's claims and ultimately determined that there was "insufficient evidence to support [Plaintiff's] allegations," communicating its findings to Plaintiff by letter dated September 30, 2021. [*Id.*, Ex. 3 at 1, 17.]

## II.    LEGAL PRINCIPLES

A motion to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) should be granted unless the complaint "state[s] a claim to relief that is plausible on its face." *United States v. Triple Canopy*, 775 F.3d 628, 634 (4th Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007). This "requires a plaintiff to demonstrate more than 'a sheer possibility that a defendant has acted unlawfully.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). In considering a Rule 12(b)(6) motion, the Court must construe the complaint, read as a whole, in the light most favorable to the plaintiff and take the facts asserted therein as true. *LeSueur-Richmond Slate Corp. v. Fehrer*, 666 F.3d 261, 264 (4th Cir. 2012).

The general pleading standard requires that the complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . [and that] give[s] the defendant fair notice of what the claim is and the grounds upon which it rests." *Anderson v. Sara*

*Lee Corp.*, 508 F.3d 181, 188 (4th Cir. 2007) (internal quotations omitted); *see also* Fed. R. Civ. P. 8(a)(2). *Twombly* established that the "plain statement" must "possess enough heft"—that is, "factual matter"—to set forth grounds for the plaintiff's entitlement to relief "that is plausible on its face." 550 U.S. at 557, 570. The complaint must contain sufficient factual allegations that, taken as true, "raise a right to relief above the speculative level" and "across the line from conceivable to plausible." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (internal citations and quotations omitted). Put another way, the facial plausibility standard requires pleading of "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Robertson v. Sea Pines Real Estate Co.*, 679 F.3d 278, 287 (4th Cir. 2012) (internal quotations omitted). "A pleading that offers labels and conclusions[,] a formulaic recitation of the elements of a cause of action . . . [or] naked assertions devoid of further factual enhancement" will not suffice. *Iqbal*, 556 U.S. at 678.

## III.    ANALYSIS

i.    <u>Counts I: Sex Discrimination (Title VII)</u>

In Count I, Plaintiff alleges that ACSB violated Title VII by "stripping her of supervisory duties and ultimately terminating her employment on the basis of her sex." [Am. Compl. ¶ 64.] ACSB argues Count I fails to plausibly allege that Plaintiff suffered any adverse action and/or that any adverse action was due to her sex. [Doc. No. 20 at 4-8.]

Title VII makes it unlawful for an employer "to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). To establish a prima facie case of discrimination, a plaintiff must allege facts that show "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class."

*Coleman v. Maryland Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). In order to survive a motion to dismiss, the plaintiff's factual allegations are not required to constitute a prima face case, however, they must be "enough to raise a right to relief above the speculative level." *Id.* (citation omitted); *McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 585 (4th Cir. 2015) (finding district court erred by requiring plaintiff to plead facts establishing a prima facie case of discrimination to survive a motion to dismiss); *see also Holloway v. Maryland*, 32 F.4th 293, 298 (4th Cir. 2022) (same).[3]

Adverse employment actions seek to "differentiate those harms that work a 'significant' detriment on employees from those that are relatively insubstantial or 'trivial.'" *Adams v. Anne Arundel Cty. Pub. Schs.*, 789 F.3d 422, 431 (4th Cir. 2015) (citation omitted). Reprimands and poor performance evaluations are typically not adverse employment actions as compared to "transfers, discharges, or failures to promote whose impact on the terms and conditions of employment is immediate and apparent." *Id.*; *Kirkland v. Mabus*, 206 F. Supp. 3d 1073, 1081 (E.D. Va. 2016) ("An adverse employment action is one that 'adversely affects the terms, conditions, or benefits of the plaintiff's employment,' such that the employee suffers 'some significant detrimental effect' from the action in question." (citation omitted)).

Plaintiff argues that the Amended Complaint sufficiently alleges that she suffered an adverse employment action based on her sex when Hutchings, as part of the restructuring effort, eliminated Plaintiff's COO position and "stripped her of her job duties with six months left in her position." [Doc. 22 at 8.] Plaintiff also argues that Hutchings intentionally treated Plaintiff

---

[3] Although a plaintiff "need not plead facts that constitute a prima facie case," the "framework may nonetheless be used to inform a court's evaluation of a plaintiff's allegations." *Shomo v. Apple, Inc.*, 2015 WL 777620, at *4 (W.D. Va. Feb. 24, 2015) (citing *Coleman*, 626 F.3d at 190; *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 764-65 (4th Cir. 2003)).

differently from male employees, as he never intimidated, berated, criticized, or intentionally left them out of meetings. [*Id.* at 8-9.]

Plaintiff's allegations of general harassment do not sufficiently constitute an adverse employment action because they did not affect the terms and conditions of her employment. *See Munday v. Waste Mgmt. of N.A., Inc.*, 126 F.3d 239, 243 (4th Cir. 1997) (holding as a "matter of law" that a supervisor's "yelling at [the plaintiff during a meeting], directing other employees to ignore her and to spy on her, and generally refusing to communicate with her concerning her employment-related complaints" did not "not rise to the level of an adverse employment action for Title VII purposes"); *Gray v. Winter*, 2006 WL 1117804, at *7 (E.D. Va. Apr. 25, 2006) ("[E]xcluding plaintiff from management meetings or communications does not qualify as an adverse employment action as doing so did not materially alter the 'terms, conditions, or benefits' of her employment."); *cf. Garrett v. Cape Fox Facilities Servs.*, 2020 WL 265869, at *7 (E.D. Va. Jan. 17, 2020) (finding that, for purposes of ruling on a 12(b)(6) motion, work-related criticism and scrutiny do not rise to the level of adverse employment actions).

But Plaintiff's allegations regarding the elimination of her position and loss of supervisory responsibilities do plausibly allege an adverse employment action. *See, e.g.*, *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999) (examples of adverse actions include: "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion").[4] Plaintiff, however, must also allege facts that make plausible that these adverse

---

[4] *See also Kangethe v. Dist. of Columbia*, 953 F. Supp. 2d 194, 201 (D.D.C. 2013) ("'[N]o doubt' that 'the removal of [the employee's] supervisory responsibilities constituted an adverse employment action.'" (quoting *Burke v. Gould*, 286 F.3d 513, 522 (D.C. Cir. 2002))); *cf. Fordyce v. Prince George's Cty.*, 43 F. Supp. 3d 537, 548 (D. Md. 2014) ("[A] new job assignment with reduced supervisory duties or diminished responsibility can constitute an adverse employment action." (citations omitted)).

actions were "*because of*" her sex. *McCleary-Evans*, 780 F.3d at 585 (emphasis in original) (quoting 42 U.S.C. § 2000e–2(a)(1)).

Plaintiff's allegations fail to support a reasonable inference that she lost her supervisory responsibilities and position because of her sex. The restructuring plan devised by Hutchings sought to eliminate seven positions, at least two of which were held by males and thus outside Plaintiff's protected class. [Am. Compl. ¶¶ 47-54, Ex. 2.] However, at least one male was rehired for a different position while at least two females (including Plaintiff) who held other affected positions were not rehired. [*Id.* ¶ 49.] This disparity in treatment may have allowed the required inference of discrimination but for Plaintiff's allegations that ACSB hired Dr. Alicia Hart, a female in her thirties, to fill the newly created role of Executive Director of Facilities and Operations, a position that although "organizationally lower, mirrored that of [Plaintiff's role] as Chief Operating Officer in operational direction of the same five sub-departmental areas." [*Id.* ¶ 52.] Moreover, the inferences to be drawn from the specific allegations of discrimination—comments that Plaintiff's ideas were "old school" and Stone was "stodgy and monotone," as well as Hutchings' failure to refute Plaintiff's claim that he had always been biased against Stone because of his age—goes to age (discussed below), not sex discrimination.

Similarly, Plaintiff fails to allege facts that make plausible her claim that the loss of many of her supervisory duties was because of her sex. The allegations regarding this time period do not mention sex. For example, Plaintiff alleges that she was "ignored and intentionally left out of meetings and made to feel her ideas and process changes that she implemented could not be effective given her advanced age." [Am. Compl. ¶ 55.] And again, Plaintiff's main allegation, that Wilkins and Hutchings called her ideas "old school" goes to age, not sex, discrimination. For the above reasons, Count I will be dismissed for failure to state a claim.

ii.   Count II: Hostile Work Environment (Title VII)

In Count II, Plaintiff alleges that ACSB created a hostile work environment by "(1) ignoring Plaintiff's complaints; (2) undermining Plaintiff's authority; (3) removing Plaintiff's supervisory duties; (4) yelling at Plaintiff; (5) disparaging Plaintiff in front of and to her co-workers; (6) treating Plaintiff as an outsider; and (7) terminating Plaintiff." [Am. Compl. ¶ 70.] ACSB argues that the Amended Complaint fails to allege that any harassment was based on her sex and/or was severe or pervasive. [Doc. No. 20 at 8-10.] In order to establish a claim for hostile work environment, a plaintiff must demonstrate that the alleged conduct (1) was unwelcome; (2) resulted because of her gender, disability, or prior protected activity; (3) was sufficiently severe or pervasive to alter the conditions of her employment; and (4) was imputable to her employer. *See Pueschel v. Peters*, 577 F.3d 558, 564-65 (4th Cir. 2009).

Plaintiff alleges that Hutchings "generally took the posture of not seeking or taking advice from individuals who were older women . . . instead choosing to only dictate to them what he wanted them to do." [Am. Compl. ¶ 18.]  But the Amended Complaint fails to allege how any of the alleged conduct was *because of* her sex. *See Valerino v. Holder*, 2013 WL 12432290, at *8-9 (E.D. Va. Feb. 20, 2013) (dismissing hostile work environment claims where although the plaintiff alleged that "male employees were not treated in the same fashion" none of the "alleged incidents involved sexual comments, innuendo, or activities causally tied to Plaintiff's gender"); *cf. Smith v. First Union Nat'l Bank*, 202 F.3d 234, 242 (4th Cir. 2000) (plaintiff "sufficiently alleged" supervisor "harassed her 'because of' her gender" where "[e]xplicit and derogatory references to women appear in virtually all of [the] harassing remarks"); *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331-32 (4th Cir. 2003) (trier of fact may reasonably find discrimination when "a female victim is harassed in such sex-specific and derogatory terms . . . as to make it clear that the harasser

is motivated by general hostility to the presence of women in the workplace" (alteration in original) (citation omitted)). Plaintiff also alleges that Hutchings did not treat male employees in the same manner. However, in her one specific example, the November 15th meeting, a male employee was also subjected to Hutchings' vitriol, causing Hutchings to later offer an apology to that employee. [Am. Compl. ¶¶ 38-41.] Plaintiff's factual allegations, therefore, do not allow the Court to draw a reasonable inference that the alleged conduct was because of Plaintiff's sex.

Plaintiff also fails to allege adequately that the harassment was severe or pervasive. "To demonstrate that a defendant's behavior was 'objectively severe and pervasive at the motion to dismiss stage, [the plaintiff] must allege sufficient facts plausibly demonstrating that the workplace was permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment.'" *Salley v. Sch. Bd. of Amelia Cty.*, 2021 WL 5760893, at *15 (E.D. Va. Dec. 3, 2021) (alterations in original) (citations omitted). This is a "high bar." *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008). "[I]ncidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 208 (4th Cir. 2019) (alteration in original) (quoting *Sunbelt*, 521 F.3d at 315). "[R]ude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable under Title VII." *Id.* (alterations in original) (quoting *Sunbelt*, 521 F.3d at 315-16).

Plaintiff alleges Hutchings, and Wilkins to some extent, refused to meet with her, yelled at her in front of co-workers, called her a traitor, undermined her authority, prematurely took away some of her responsibilities and supervisory duties,[5] "generally" had a posture of not taking advice

---

[5] The removal of responsibilities and supervisory duties do not sufficiently allege a "pervasive or severe pattern of harassment." *Perez v. Guzman*, 2022 WL 1746658, at *4-5 (D.D.C. May 31, 2022) (dismissing plaintiff's hostile

from older women, and treated her like an outsider. Plaintiff's complaints are more akin to a "personality conflict" with Hutchings and Wilkins resulting in incidents that give "rise to bruised or wounded feelings." As such, Plaintiff fails to plausibly allege that the harassment was severe or pervasive. Accordingly, Count II will be dismissed for failure to state a claim.

    iii.    <u>Count III: Retaliation Claim (Title VII)</u>

In Count III, Plaintiff alleges that she engaged in protected activity under Title VII and was then subjected to adverse employment actions. [Am. Compl. ¶¶ 82-83.] ACSB argues that Plaintiff did not engage in the required "protected activity" to support a claim for retaliation under Title VII. [Doc. No. 20 at 11.]

Title VII prohibits employers from "discriminat[ing] against any of [their] employees . . . because [the employees] ha[ve] opposed any practice made an unlawful employment practice by [Title VII], or because [the employees] ha[ve] . . . participated in any manner in an investigation." 42 U.S.C. § 2000e–3(a). The elements of a prima facie retaliation claim are: (1) engagement in a protected activity, (2) adverse employment action, and (3) a causal link between the protected activity and the employment action. *See Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir. 2004).

"In the context of element one of a retaliation claim, an employee is protected when she opposes 'not only . . . employment actions actually unlawful under Title VII but also employment actions [she] reasonably believes to be unlawful.' The Title VII violation may be complete, or it may be in progress." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 282 (4th Cir. 2015) (en banc) (alterations in original) (quoting *E.E.O.C. v. Navy Fed. Credit Union,* 424 F.3d 397, 405-06 (4th Cir. 2005)).

---

work environment claim, which was "an amalgamation of his discrimination and retaliation claims," based in part on "management's removal of [plaintiff's] supervisory duties").

As Plaintiff acknowledges in her opposition, Title VII prohibits employment discrimination on the basis of certain protected classes, including race, sex, national origin, color, and religion. [Doc. No. 22 at 12.] However, in her November 11, 2019, letter to ACSB—the sole instance of protected activity the parties focus on in their briefing—Plaintiff does not complain about, or even suggest, employment actions that are, or might be, unlawful under Title VII. The letter is entirely focused on Hutchings' (male) treatment of Stone (male). The letter contains no reference to sex. Rather, the letter expresses concerns, in part, about Hutchings' "personal bias" based on Hutchings' "controversial, inappropriate and potentially damaging characterization of [Stone's] leadership style, professional reputation and execution of his duties . . . all without proof or complete information" in remarks he made to the Transportation Office personnel. [Am Compl., Ex. 1 at 1.] Although Plaintiff does warn ACSB about the "risk of potential legal action," she appears to raise that possibility based on her concern that ACSB members and Hutchings' "misplaced" blame on Stone for the pay scale dispute "places the division in jeopardy of defamation charges." [*Id.* at 2]; *see generally Bonds v. Leavitt*, 629 F.3d 369, 384 (4th Cir. 2011) ("Title VII is not a general bad acts statute, however, and it does not prohibit private employers from retaliating against an employee based on her opposition to discriminatory practices that *are outside the scope* of Title VII." (emphasis added) (citation omitted)). For the foregoing reasons, Count III will be dismissed for failure to state a claim.

    iv.   Count IV: Age Discrimination (ADEA)

In Count IV, Plaintiff alleges she was subjected to discrimination on the basis of age.[6] The ADEA "prohibits employers from refusing to hire, discharging, or otherwise discriminating

---

[6] Defendant contends that despite its title as an age discrimination claim, Count IV in substance is a claim for retaliation. However, construing the Amended Complaint liberally, including all of the allegations that are incorporated by reference as well as the specific reference to the substantive age discrimination statute, as discussed above, Plaintiff adequately alleged an age discrimination claim in Count IV.

against any person who is at least 40 years of age 'because of' the person's age." *E.E.O.C. v. Balt. Cty.*, 747 F.3d 267, 272 (4th Cir. 2014) (internal quotation marks omitted); *see* 29 U.S.C. §§ 623(a), 631(a).[7] "In order to make out a prima facie case under the ADEA, the Plaintiff must show that [she] (1) was a member of a protected class, i.e., age 40 or older, (2) suffered an adverse employment action, (3) was meeting [her] employer's expectations at the time of the adverse action, and (4) was replaced by or treated less favorably than someone outside the protected class or someone 'substantially younger.'" *Sullivan v. Perdue Farms, Inc.*, 133 F. Supp. 3d 828, 837 (E.D. Va. 2015) (citations omitted).

Plaintiff alleges sufficient facts that make plausible her age discrimination claim under the ADEA. Plaintiff's allegations satisfy the first three elements, as she was a member of the protected class, was terminated and/or lost her supervisory duties, and was meeting her employer's expectation at the time of the adverse action.[8] The closer question is whether Plaintiff sufficiently alleges that she was treated less favorably than and/or replaced by someone outside the protected class or someone substantially younger.

Hutchings and Wilkins referred to Plaintiff's ideas as "old school." [Am. Compl. ¶ 56.] During her meeting with Hutchings following the submission of her letter to ACSB, Plaintiff told Hutchings that he had always been biased against Stone because of Stone's age, which Hutchings did not deny, stating only that he did not think positively of Mr. Stone. [*Id.* ¶ 35.] The restructuring plan sought to eliminate seven positions, all of which were held by persons over the age of 40, three of whom were 65 years of age or older. [*Id.* ¶ 47.] The list circulated by ACSB of the affected

---

[7] The ADEA defines the term "employer" to include "any agent," 29 U.S.C. § 630(b), which the Fourth Circuit interprets as "an unremarkable expression of respondeat superior—that discriminatory personnel actions taken by an employer's agent may create liability for the employer," *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 510 (4th Cir. 1994).

[8] At this stage, and given the various adverse actions alleged, the Court need not wade into whether ACSB or Hutchings was the formal decision maker and if ACSB possessed discriminatory animus or such animus is imputed to it through Hutchings' actions. *See generally Lim v. Azar*, 310 F. Supp. 3d 588, 602 (D. Md. 2018).

employees listed their ages. [*Id.*, Ex. 2; Doc. No. 22 at 16.] The youngest affected employee, Mann (45 years old), was given an opportunity to be rehired while older employees (ages 55, 65, 71) were not given that opportunity. Although there is no "bright line" rule for what age difference qualifies as "substantially younger," most courts agree that an age difference of ten years or more satisfies the fourth element. *Ulrich v. CEXEC, Inc.*, 233 F. Supp. 3d 515, 526-27 (E.D. Va. 2017) (summarizing case law).[9] The age difference between Mr. Mann and Plaintiff satisfies the "substantially younger" prong. Additionally, the restructuring plan created a new position that "mirrored" the "operational direction" of Plaintiff's COO role that was filled by Alicia Hart, a woman in her 30s and outside the protected class, whose years of "practical, technical and business operational experience pales in comparison" to Plaintiff's.[10] [Am. Compl. ¶ 54.] Although Wilkins is an individual close in age to Plaintiff who took over some of Plaintiff's responsibilities, the Amended Complaint alleges special circumstances regarding the relationship between Hutchings and Wilkins which may justify this lone exception. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) ("The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as [she] has lost out *because of [her] age*."). For these reasons, Plaintiff has alleged facts that make plausible her claim of age discrimination and the Motion will be denied as to Count IV.

  v. <u>Count V: Hostile Work Environment (ADEA)</u>

   In Count V, Plaintiff alleges that she was subjected to a hostile work environment based on age for many of the same reasons alleged in Count II. For the same reasons that caused the

---

[9] In her opposition, Plaintiff focuses on the age of Wilkins, not Dr. Alicia Hart, in arguing that she sufficiently states an ADEA discrimination claim. [Doc. No. 22 at 16-17.] As alleged in the Amended Complaint, Wilkins is 62 years old. [Am. Compl. ¶ 19.] While Plaintiff argues in her opposition that she was 67 years old at the time of the adverse action, the Amended Complaint makes clear that she was no older than 65 years old. [*Id.* ¶¶ 6 n.1, 92.] The age difference of three years between Wilkins and Plaintiff fails to satisfy the fourth element of a prima facie claim.

[10] Although this position included an advanced degree requirement, ACSB had previously hired Plaintiff as COO even though she did not possess the advanced degree required for that position. [Am. Compl. ¶¶ 11, 13, 52-53 n.14].

Court to dismiss Count II, Plaintiff fails to allege facts that make plausible that the alleged harassment was "sufficiently severe or pervasive." *Bass*, 324 F.3d at 765. As pleaded, the alleged conduct amounted to, at most, callous behavior that resulted in wounded or bruised feelings. *Perkins*, 936 F.3d at 208; *Buchhagen v. ICF Int'l, Inc.*, 545 F. App'x 217, 219 (4th Cir. 2013) (yelling, pounding hands on desk, harping on plaintiff's mistake, making "snide comments," playing favorites with employees, and unfairly criticizing plaintiff did not amount to severe or pervasive harassment). Additionally, Plaintiff's allegations that Hutchings and Wilkins called her ideas "old school" is not enough to establish severe or pervasive harassment. *Coleman v. Pentagon Fed. Credit Union*, 2017 WL 1044693, at \*5 (E.D. Va. Mar. 17, 2017) (finding plaintiff's allegation of one comment that "she had 'gray hair' and was 'too old' to work at PenFed" fell short of pleading pervasive or severe abuse). Accordingly, Count V will be dismissed.

      vi.   <u>Count VI: Retaliation (ADEA)</u>

In Count VI, Plaintiff alleges that she "engaged in protected activity when she made complaints about age discrimination," and, after making those complaints, was "subjected to adverse employment actions," including the removal of her supervisory duties and the elimination of her position. [Am. Compl. ¶¶ 108, 111-13.] Under the ADEA, it is "unlawful for an employer to discriminate against any of his employees . . . because such individual . . . has opposed any practice made unlawful by [the ADEA]." 29 U.S.C. § 623(d). A plaintiff may state a prima facie case of retaliation, by alleging facts that demonstrate that: "(1) [she] engaged in protected activity; (2) an adverse employment action was taken against [her]; and (3) there was a causal link between the protected activity and the adverse action." *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006) (en banc).

As with her Title VII retaliation claim, Plaintiff's November 11th letter did not constitute protected activity under the ADEA because it never mentioned or implied that Hutchings discriminated or harassed Stone on the basis of his age. However, unlike her Title VII claim, the Amended Complaint contains additional factual allegations that plausibly plead an ADEA retaliation claim. In that regard, the Amended Complaint alleges that following his receipt of the November 11th letter to ACSB, Hutchings called Plaintiff into a meeting where he indicated that "he was particularly offended by the accusation of bias" included in the letter. [Am. Compl. ¶¶ 34-35.] Plaintiff then responded to Hutchings that "she believed based on previous statements and treatment of Mr. Stone that Dr. Hutchings (male, 42) had always been biased against Mr. Stone (male, 71) *because of his age*." [*Id.* ¶ 35 (emphasis added).] According to the Amended Complaint, Hutchings did not outright deny that claim; instead, Hutchings "conceded that he never thought positively of Mr. Stone." [*Id.*] Several weeks later, on December 6th, Hutchings informed Plaintiff that her position would be eliminated. [*Id.* ¶ 44.] The following month, after ACSB's approval of the restructuring on January 9, 2020, Plaintiff was stripped of her supervisory duties. [*Id.* ¶ 56.]

These facts plausibly allege a retaliation claim. First, Plaintiff's complaints to Hutchings that he was "biased" against Stone on the basis of his age qualifies as protected activity. *See, e.g.*, *Buchhagen*, 545 F. App'x at 221 (plaintiff engaged in protected activity where she, in a meeting, specifically stated that she was being harassed because of her age); *Fisher v. Winston-Salem Police Dep't*, 28 F. Supp. 3d 526, 532 (M.D.N.C. 2014) ("An activity is protected when the plaintiff has 'an objectively reasonable belief that she was complaining about' discriminatory conduct." (citation omitted)).[11] Second, Plaintiff suffered adverse employment actions, including termination

---

[11] *See also DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015) (observing that "opposition activity" includes "utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities" as well as making complaints to management (citations omitted)).

and loss of supervisory responsibilities. *Buchhagen*, 545 F. App'x at 221 ("[Plaintiff] clearly suffered an adverse employment action (termination)."); *Williams v. Guilford Tech. Cmty. Coll. Bd. of Trs.*, 117 F. Supp. 3d 708, 720 (M.D.N.C. 2015) ("The adverse employment action must be one that a reasonable employee would have found materially adverse, which, in this case, means that it 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006))). Finally, Plaintiff sufficiently alleges a casual link between the protected activity and adverse action. Plaintiff complained to Hutchings' about his age discrimination in regard to Stone in or around November 11, 2019. Less than a month later, Hutchings informed Plaintiff that her position would be eliminated. Approximately one month later, Plaintiff learned she had been stripped of her supervisory duties. An approximate range of 3-8 weeks between the protected activity and the adverse actions, at this stage, plausibly alleges causality. *See Okoli v. City of Balt.*, 648 F.3d 216, 224 (4th Cir. 2011) (causality prong satisfied, in part, where the supervisor, as the alleged harasser "surely would have known" the nature of the complaint); *cf. Perry v. Kapos*, 489 F. App'x 637, 643 (4th Cir. 2012) ("Although neither we nor the Supreme Court have adopted a bright temporal line, we have held that a three- or four-month lapse between the protected activities and discharge was 'too long to establish a causal connection by temporal proximity alone.'" (citation omitted)). For the foregoing reasons, the Motion will be denied as to Count VI.

vii.   Count VII: Violation of Rights under Title IX

a.   *Statute of Limitations*

In their Motion, ACSB argues that Plaintiff's Title IX claims are untimely. [Doc. No. 20 at 16-18.] Since Title IX "does not contain an express statute of limitations" the Court should instead "apply 'the most closely analogous statute of limitations under state law.'" *Doe v. Va.*

*Polytechnic Inst. & State Univ.*, 400 F. Supp. 3d 479, 494 (W.D. Va. 2019) (citations omitted). In

*Doe*, the Court applied Virginia's general statute of limitations for personal injury claims (2 years)

to plaintiff's Title IX claims. *Id.* at 496; *Graham v. City of Manassas Sch. Bd.*, 390 F. Supp. 3d

702, 709 (E.D. Va. 2019) (same). When a federal court borrows a state's statute of limitations, it

"must also borrow that state's 'coordinate tolling rules.'" *Graham*, 390 F. Supp. 3d at 709 (citation

omitted). However, the accrual of a claim under a federal statute is a question of federal law.

*Owens v. Balt. City State's Attorneys Office*, 767 F.3d 379, 388-89 (4th Cir. 2014). "[U]nder

federal common law, the 'standard rule' is 'that accrual occurs . . . when the plaintiff knows or has

reason to know of his injury.'" *Graham*, 390 F. Supp. 3d at 710 (alteration in original) (quoting

*Owens*, 767 F.3d at 389). And in determining when the claim accrues, the "proper focus is upon

the time of the discriminatory acts, not upon the time at which the consequences of the acts became

most painful." *Doe*, 400 F. Supp. 3d at 490 (quoting *Delaware State College v. Ricks*, 449 U.S.

250, 258 (1980)).

As alleged, Plaintiff knew on December 6, 2019 of the planned elimination of her position,

which the ACSB officially approved on January 9, 2020. Therefore, Plaintiff knew of her injury

no later than January 9, 2020, but did not file her complaint until February 1, 2022. Nevertheless,

Plaintiff also alleges conduct post-dating the January 9, 2020 elimination of her position, namely

the stripping of her supervisory duties, which allegedly carried on until the official elimination of

her position on June 30, 2020.

While not briefed by the parties, the tort principle of "continuing violation" or "continuing

harm" may apply to Plaintiff's claims. *See DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018)

("[W]hen a harm has occurred more than once in a continuing series of acts or omissions, a plaintiff

under certain circumstances may allege a 'continuing violation' for which the statute of limitations

runs anew with each violation." (citation omitted)). Therefore, the Court cannot firmly conclude, at this stage, that Plaintiff's Title IX claims are time barred.[12]

### b.  *Failure to allege Title IX claim*

Even if not time barred, Plaintiff's Title IX claim fails to state a claim for two reasons. First, Title IX "requires that a funding recipient have notice that it may be liable for a monetary award, *i.e.*, it must actually be aware of the discrimination and fail to remedy it." *Baynard v. Malone*, 268 F.3d 228, 237 (4th Cir. 2001) (citation and quotation omitted). The Amended Complaint contains no allegations that ACSB had notice or was otherwise aware of any discriminatory conduct post-February 1, 2020. *See* [Doc. No. 20 at 18-20]; *see also Rasnick v. Dickenson Cty. Sch. Bd.*, 333 F. Supp. 2d 560, 565-66 (W.D. Va. 2004) (superintendent's knowledge of the discrimination was insufficient to confer actual knowledge on the school board for Title IX liability). Second, for essentially the same reasons that Plaintiff failed to state a claim for sex discrimination under Title VII, she has failed to state a claim under Title IX.  In that regard, Title IX provides, in part, that "no person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance," 20 U.S.C. § 1681(a), and employment discrimination claims under Title IX are "evaluated borrowing from the framework of Title VII of the Civil Rights Act of 1964." *Colley v. Dikenson Cty. Sch. Bd.*, 2018 WL 4266864, at *6 (W.D. Va. Sept. 6, 2018) (citing *Preston v. Va. ex rel. New River Cmty. Coll.*, 31 F.3d 203, 207 (4th Cir. 1994)).

---

[12] Plaintiff's argument that her claims should toll to accommodate her Title VII administrative exhaustion requirements appears inconsistent with Fourth Circuit pronouncements on this issue. *See Battle v. Ledford*, 912 F.3d 708, 713 (4th Cir. 2019) ("Virginia lacks a generally applicable statute that pauses limitations to accommodate administrative exhaustion requirements." (citing Va. Code Ann. § 8.01-229)).

viii.   <u>Dismissal of Punitive Damages Claims</u>

ACSB argues Plaintiff's claims for punitive damages should be dismissed. [Doc. No. 20 at 20-21.] Plaintiff fails to respond to this argument in her opposition. Plaintiff's only surviving claims are Counts IV and VI, discrimination and retaliation claims brought under the ADEA. As the Fourth Circuit has held, "[p]unitive damages are not available under the ADEA." *Farris v. Lynchburg Foundary*, 769 F.2d 958, 967 n.11 (4th Cir. 1985) (citation omitted). Accordingly, any punitive damages Plaintiff seeks with respect to Counts IV and VI, [Am. Compl., Prayer for Relief], are dismissed.

## IV.   CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that Defendant's Motion to Dismiss [Doc. No. 19] be, and the same hereby is, **GRANTED** in part and **DENIED** in part. It is **GRANTED** as to Counts I, II, III, V, and VII of the Amended Complaint and **DENIED** as to Counts IV and VI of the Amended Complaint; and it is further

ORDERED that Plaintiff's claim for punitive damages be, and the same hereby is, **DISMISSED**.

The Clerk is directed to forward a copy of this Order to all counsel of record.

_____
Anthony J. Trenga
United States District Judge

July 7, 2022
Alexandria, Virginia

25